IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| TELEPHONE SCIENCE CORPORATION, dba Nomorobo, a Delaware Corporation,<br><br>        Plaintiff,<br><br>v.<br><br>SYNCHRONY FINANCIAL,<br><br>        Defendant. | Case No. _____<br>JURY TRIAL DEMANDED |

**COMPLAINT**

1.     Plaintiff Telephone Science Corporation does business as "Nomorobo." It exists to solve a problem that bedevils modern society: to help individuals and businesses block unwanted phone calls placed through automated dialing methods, and to stop the torrent of pre-recorded phone calls to which we are all subjected. As Congress knew when it passed the Telephone Consumer Protection Act, such calls are a costly and harmful waste of people's time and money—and they can be even more dangerous than that when they lead unsuspecting callers into fraudulent schemes both great and small.

2.     Nomorobo is one of the companies that pioneered services to block numbers associated with autodialers and robocalls. To operate its business, Nomorobo pays to maintain approximately 290,000 telephone numbers that have not belonged to any individual in years. Instead, these lines exist to receive and record inbound calls from autodialers and pre-recorded voices. Nomorobo then places these numbers on a block list so that users of its services do not receive calls from these phone numbers. Nomorobo calls the lines it maintains for this purpose "the honeypot."

3.     Maintaining the honeypot comes with real costs, and every call to the honeypot increases those costs. Nomorobo has paid approximately $600,000 to $1,000,000 per year for direct expenses incurred with its phone providers as a result of the crushing volume of unsolicited calls directed at honeypot lines. Each new illegal, unsolicited call increases that cost because Nomorobo pays a fee for each inbound call it receives.

4. Defendant Synchrony Financial has repeatedly been caught with its metaphorical hands in the honeypot. In the last four years, Nomorobo has captured at least 2,368 calls from Synchrony using illegal recorded voices.

5. Nomorobo now brings this complaint for statutory damages and injunctive relief to put a stop to these unwanted and damaging calls for Nomorobo, its customers, and others impacted by Synchrony's illegal practices.

## Parties

6. Plaintiff Telephone Science Corporation, dba Nomorobo, is a Delaware corporation with its principal place of business in New York.

7. Defendant Synchrony Financial is Delaware corporation whose principal place of business is Stamford, Connecticut.

## Jurisdiction and Venue

8. This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227(b)(3).

9. This Court may exercise personal jurisdiction over Synchrony, and venue is proper here, because Connecticut is Synchrony's principal place of business.

## The Harm From Spam and Scam Calls, And The Law's Response

10. Robocalls are not merely an annoyance; they pose significant financial threats to consumers. In 2018, an estimated 40% of robocalls were fraudulent, leading to substantial monetary losses. Nomorobo's own internal data agrees with this: a very high percentage target senior citizens, and are schemes related to healthcare fraud, end-of-life fraud, and identity theft.

11. This is a huge problem. According to the FCC, Americans receive around 4 billion unwanted robocalls *per month*. The FCC, as it has explained, "knows that these calls are a major concern of millions of Americans, and scam calls in particular"—that is, unwanted, fraudulent solicitations—"can result in very real financial losses and serious consumer frustration." Those total losses are estimated to be about $25 billion per year. About 30% of all telephone calls in the United States are unwanted scam or spam (unwanted, although not fraudulent) calls.

12. By intercepting and blocking these calls for users, Nomorobo plays a crucial role in safeguarding consumers' financial well-being. Nomorobo also contributes to the broader economy by reducing the resources expended on addressing the consequences of fraudulent robocalls. Its efforts have been recognized by the FTC, and the service has been featured in prominent media outlets such as CBS News, The Wall Street Journal, and Wired.

13. Because Nomorobo's data and technology are among the industry leaders, Nomorobo also frequently collaborates with both law-enforcement agencies and large telecommunications operators to find new ways to track down spammers and scammers and to prevent abuse.

14. The main federal law protecting businesses and consumers from unwanted calls is the Telephone Consumer Protection Act, or TCPA, 47 U.S.C. § 227. It was passed because, as one Senator noted, "[c]omputerized calls are the scourge of modern civilization." 137 Cong. Rec. 30,821 (1991).

15. As relevant here, the TCPA prohibits making a call using an "artificial or prerecorded voice" to "any service for which the called party is charged for the call," again with the only exceptions being if the recipient has given express consent or if the call is made for emergency services. *Id.* § 227(b)(1)(A)(iii).[1]

16. This provision is essentially a complete bar on making "robocalls" to cellular phones or other lines, like those Nomorobo owns, that charge a user for every incoming call. As the Court is likely aware based on the very high call volume of robocalls, this provision is very frequently violated, much to the chagrin of the American public.

17. Because of the nature of the injury robocalls cause, and to incentive private parties to bring suit for calls that might individually be only a minor nuisance, Congress permitted two types of relief under the TCPA. The TCPA permits a "person or entity" to bring an action to enjoin the violation and to recover either actual damages or statutory damages, whichever is greater. *Id.* § 227(b)(3). The statutory damages are $500 for any violation or $1,500 for any willful violation. *Id.* The TCPA is a strict-liability statute.

### Nomorobo's Business of Blocking Harmful, Unwanted Calls

18. Nomorobo and its employees and officers are dedicated to protecting consumers from these unwanted calls, and have been since the company's founding.

---

[1] The third statutory exception, for calls made "solely to collect a debt owed to or guaranteed by the United States," was found unconstitutional and severed from the statute by *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 636 (2020). Accordingly, it no longer applies.

4

The idea for Nomorobo was developed in 2012, when the Federal Trade Commission launched the Robocall Challenge, inviting innovators to develop solutions to block illegal robocalls. Nomorobo's solution, which used "simultaneous ringing" to identify and terminate illegal robocalls before they reached consumers, emerged as one of the winners of the contest. This was a breakthrough at the time, and the product was hailed by the FTC and industry as marking an important leap forward in the fight against unwanted calls.

19. Nomorobo was founded in 2013 in the wake of this challenge. Then as now, Nomorobo's primary mission is to protect consumers from the nuisance and fraud associated with robocalls. Nomorobo offers its solution for free for landline customers, and offers an app for mobile users.

20. The product is powerful. Nomorobo's basic mobile offering for mobile phones compares incoming numbers to its massive database of scam and spam callers—created using the honeypot system described below—and blocks offending numbers. Nomorobo Max works slightly differently, by forcing unknown callers to pass a screen before being connected to the recipient. The products cost $1.99 to $5.99 per month, or $19.99 to $79.99 per year. With any Nomorobo product, the effect for the user is a large reduction in receipt of unwanted calls.

21. Nomorobo's products have been recognized for their ease of use and functionality. Between Nomorobo's regular and "Max" offering, its apps average 4.5 out of 5 stars, with nearly 25,000 reviews. It has been featured as "App of the Day" multiple times; written about in multiple media outlets, including the New York

5

Times and Wall Street Journal; and used by millions of people. To date, it has blocked over 3 *billion* unwanted, illegal, spam, or scam calls.

22. Nomorobo is a previous TCPA litigant, but it is differently situated now than during its prior attempt to hold a robocaller accountable over a decade ago.

23. In 2015, in a different court in a different state and with a somewhat different business model, Nomorobo brought a TCPA case against a different defendant in the Northern District of Illinois. *See* 15-cv-5182 (N.D. Ill.) That case was dismissed in district court on the incorrect grounds that Nomorobo was not properly within the "zone of interest" of the TCPA. Faced with increasing costs from the torrent of unwanted robocalls, Nomorobo lacked the funds to continue with an appeal of the court's decision even though that decision was wrong under Supreme Court precedent and the text of the TCPA.

24. Since then, Nomorobo has developed the Nomorobo Max product that does not rely on the honeypot. And Nomorobo is now under different ownership and wishes to again litigate under the TCPA to begin to recover some of the excessive costs that unwanted robocalls have imposed on it and to protect itself and consumers broadly against additional ongoing harm.

### The Honeypot And The Harm Nomorobo Suffers With Each Call

25. Nomorobo maintains a constantly updated blocklist of known spam and scam callers. It blocks all calls from numbers on this blocklist for its Nomorobo Basic mobile app users to ensure they receive minimal unwanted interruptions.

26. To do this, Nomorobo must identify the numbers of these unwanted callers and examine the calls to ensure that calls from a specific number can be identified as falling into this category.

27. One of the principal ways Nomorobo does this is with a system Nomorobo calls "the honeypot."

28. The honeypot consists of many thousands of phone lines, all with different numbers, across many area codes, which Nomorobo has acquired over time since the inception of the company. Most of the Honeypot numbers were acquired more than five years ago, which means that they have not been assigned to an individual for at least that long—perhaps they never belonged to an individual.

29. Nomorobo does not publish its honeypot lines or encourage calls to them.

30. The honeypot numbers are unlisted.

31. Nomorobo does not maintain these lines for the purpose of bringing litigation under the TCPA or any related statute; rather, it maintains them to provide a better product to its customers.

32. Such long-dormant, unlisted honeypot lines are ideal for identifying spam and scam calls precisely because they belong to no one, have not belonged to anyone for many years, and are not otherwise listed anywhere. There is unlikely to be a good reason for anyone to *intend* to dial a honeypot phone line, so nearly all such calls must be spam and scam callers.

33. Nomorobo uses its own data to confirm this. Nomorobo records many of the calls coming into the honeypot for the purpose of analyzing those calls to ensure

they are properly added to the blocklist. Over 99% of the calls coming into the honeypot can indeed be classified as unwanted robocalls.

34.    Each call received to a honeypot line by Nomorobo imposes direct costs on the company. Nomorobo incurs significant per-call expenses through its telephony provider, which charges additional fees for each call received to each line. Because each call costs the company money, the exact cost for maintaining the honeypot lines varies year to year. In the years preceding this Complaint, Nomorobo has typically paid $600,000 to $1 million per year in fees related to these honeypot lines. Nomorobo has recently done what it can to reduce these costs, including by switching telephony providers, but it still pays a per-call cost for each incoming call to any honeypot line.

35.    Moreover, each unwanted call imposes an additional cost on Nomorobo with no additional benefit whatever. Once Nomorobo has received one call to any one honeypot line that it can identify as a spam or scam call, the offending number goes into Nomorobo's database. From there, additional calls to the honeypot are purely harmful: they impose additional, quantifiable costs on Nomorobo with zero conceivable benefit to its business. Additional unwanted calls simply drain Nomorobo's resources.

36.    Nomorobo incurs more than just the marginal telephony cost from each unwanted call. It also puts considerable operational resources into maintaining the honeypot, transcribing calls, and updating blocklists. Handling hundreds of thousands of unwanted calls imposes IT overhead, staff time, data storage costs, and more—and each unwanted call adds to this burden, especially the logging, recording,

8

and transcribing of each individual call. The volume of calls Nomorobo receives to the honeypot makes significantly increases Nomorobo's costs. But because the very point of the honeypot is to track every incoming call, there is no feasible way to operate it more cheaply until the torrent of unwanted calls slows.

37. Precisely because these costs have grown so high from each marginal call, Nomorobo has developed a new product, known as Nomorobo Max, that operates independently of the use of the honeypot-generated block list. Instead of a block list, Nomorobo Max functions with call screening through a technique known as "conditional call forwarding." The decision to offer a new product that is not tied to the database generated through the honeypot was made, in part, so the company could begin to reduce the expense of receiving so many unwanted calls to the honeypot.

38. Nomorobo continues to maintain the honeypot, however, as consumer demand has not fully shifted to this conditional forwarding solution. That, in turn, will require Nomorobo to incur the cost of receiving, and paying for, each unwanted call to in turn protect the consumers who rely on its product.

### Defendant's Illegal Calls To The Honeypot Numbers

39. Synchrony is a large financial company whose principal business is offering co-branded credit cards for consumer companies. As part of that business (and for other business reasons), Synchrony attempts to collect consumer debt by phone.

40. Since June 1, 2021, Synchrony has placed at least 2,368 calls to Nomorobo's honeypot numbers.

9

41. Every one of these calls was made using an "artificial or prerecorded voice."

42. At least 1,050 of these calls self-identify as coming from Synchrony. These calls all use automated or pre-recorded voices and most follow the same script. The dates and call details are attached as Exhibit A.

43. Example recordings of what is clearly an artificial or pre-recorded voice identifying itself as coming from Synchrony are available at: https://perma.cc/VC3N-R7J7 (March 17, 2025). Although not all calls received have been recorded in full, Nomorobo has many additional recordings that are similar to this one.

44. The remaining 1,318 calls all come from numbers that when called identify themselves as belonging to Synchrony. The dates and call details are attached as Exhibit B.

45. These calls all use automated or pre-recorded voices and most follow the same script.

46. Example recordings of what is clearly an artificial or pre-recorded voice calling from a number that identifies itself when called as being from Synchrony are available at the following URL: https://perma.cc/YS36-R8PW (recorded December 9, 2022).

47. Defendant is in the business of debt collection and regularly makes phone calls to alleged debtors.

48. Defendant intentionally placed the calls at issue.

49. Nomorobo, which owns all of the relevant phone lines, did not consent to receive calls from Defendant, or any other entity, using an artificial or prerecorded voice.

50. Nomorobo was charged for each call it received to any honeypot line.

51. As explained, these many thousands of calls from Defendant imposed measurable costs on Nomorobo. Each individual call imposed incoming telephony costs. And each call was logged and transferred to Nomorobo's database. These, too, imposed technology and labor costs.

## Claim for Relief

### *Count One*: Violation of the Telephone Consumer Protection Act, or TCPA.

52. All prior paragraphs of this Complaint are incorporated here by reference.

53. Plaintiff Nomorobo is a "person or entity" that has been injured by these illegal calls.

54. Defendant used an "artificial or prerecorded voice" to numbers registered to Nomorobo that charge a per-call fee for each incoming call, without prior consent, in direct violation of 47 U.S.C. § 227(b)(1)(A). The attached exhibits include each alleged violation.

55. These robocalls caused Plaintiff economic harm, as Nomorobo incurs per-call fees and storage costs for every call received, as well as additional costs described above.

56. Each violation is subject to statutory damages of $500, or up to $1,500 per call for willful violations, under 47 U.S.C. § 227(b)(3).

57. Each violation was willful.

58. Plaintiff is also entitled to injunctive relief enjoining Defendant from engaging in these unlawful practices.

### Prayer for Relief

Plaintiff Telephone Science Corporation dba Nomorobo respectfully requests a trial by jury to seek the following relief:

- Statutory damages of $500 per violation, trebled to $1,500 per willful violation, under 47 U.S.C. § 227(b)(3).

- Injunctive relief to prevent future illegal calls from Defendant and benefit Nomorobo and the public.

- Attorneys' fees and costs as permitted by law.

- Any other relief this Court deems just and proper.

Respectfully submitted,


THE PLAINTIFF

*/s/ Jonathan J. Einhorn*

JONATHAN J. EINHORN
129 WHITNEY AVENUE
NEW HAVEN, CT 06510
FED BAR ct 00163
203-777-3777

Case 3:25-cv-00940-VAB   Document 1   Filed 06/12/25   Page 14 of 14

*/s/ Charles Gerstein*
Charles Gerstein
(*pro hac vice* application forthcoming)
GERSTEIN HARROW LLP
400 7th Street NW, Suite 304
Washington, DC 20009
charlie@gerstein-harrow.com
(202) 670-4809

*/s/ Jason Harrow*
Jason Harrow
(*pro hac vice* application forthcoming)
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*Attorneys for Plaintiff Telephone Science Corporation*

13