**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TELEPHONE SCIENCE CORPORATION,<br>        *Plaintiff*,<br><br>        v.<br><br>SYNCHRONY FINANCIAL,<br>        *Defendant.* | No. 3:25-cv-00940 (VAB) |

**RULING AND ORDER ON MOTION TO DISMISS**

Telephone Science Corporation, who does business as "Nomorobo" ("Plaintiff" or

"TSC"), has filed a complaint against Synchrony Financial ("Synchrony" or "Defendant")

alleging a violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C.

§ 227(b)(1)(A). Compl., ECF No. 1 ("Compl.").

Synchrony has filed a motion to dismiss TSC's Complaint. Mot. to Dismiss, ECF No. 37

("Mot.").

For the following reasons, the motion to dismiss is **GRANTED** with prejudice.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

**A.  Factual Allegations**

Founded in 2013, TSC is a company that allegedly created a solution for illegal robocalls.

Compl. ¶¶ 18–19. TSC's solution allegedly used "simultaneous ringing" to identify and terminate

illegal robocalls before they reached consumers. *Id.* ¶ 18. TSC allegedly offers its service free of

charge for landline customers and provides a mobile application for a fee of $1.99 to $5.99 per

month or $19.99 to $79.99 per year. *Id.* ¶ 20. To date, TSC allegedly has blocked over three

billion unwanted, illegal, spam, or scam calls. Compl. ¶ 21.

TSC's business model is centered around a system it calls "the honeypot." Compl. ¶ 27. The honeypot allegedly consists of approximately 290,000 telephone numbers, most of which were acquired more than five years ago and have not been assigned to any individual during that period, if ever. Compl. ¶¶ 2, 28. TSC allegedly does not publish its honeypot lines or encourage calls to them, and the numbers are allegedly unlisted. Compl. ¶¶ 29–30. TSC allegedly maintains these lines to provide a better product to its customers by identifying spam and scam callers and placing their numbers on a block list. Compl. ¶¶ 25–26, 31.

Because the honeypot numbers have not belonged to any individual for many years and are otherwise unlisted, TSC alleges that nearly all calls received on these lines, allegedly over ninety-nine percent based on TSC's data, can be identified as spam or scam calls. Compl. ¶¶ 32-33. Each call received to a honeypot line allegedly costs TSC a per-call fee charged by its telephony provider. Compl. ¶ 34. TSC allegedly has typically paid $600,000 to $1,000,000 per year in fees related to its honeypot lines. Compl. ¶¶ 3, 34. Once the originating number is already on TSC's block list, each additional unwanted call allegedly imposes a cost on TSC without any corresponding business benefit. Compl. ¶ 35. TSC alleges that the volume of calls also generates costs related to information technology ("IT") overhead, staff time, and data storage. Compl. ¶ 36. TSC allegedly developed a new product named Nomorobo Max to reduce these additional costs. *Id.* at ¶ 37. Nomorobo Max allegedly operates independently of the honeypot-generated block list through a technique known as "conditional call forwarding," although TSC continues to maintain the honeypot due to continued consumer demand. *Id.* ¶¶ 37-38.

Synchrony is a financial company whose principal business is offering co-branded credit cards for consumer companies. Compl. ¶ 39. As part of that business, Synchrony allegedly attempts to collect consumer debt by telephone. *Id.* Since June 1, 2021, Synchrony has allegedly

placed at least 2,368 calls to TSC's honeypot numbers. Compl. ¶ 40. TSC alleges that each of these calls was made using an "artificial or prerecorded voice." Compl. ¶ 41. At least 1,050 of these calls allegedly identify as coming from Synchrony. Compl. ¶¶ 42–43. The remaining 1,318 calls allegedly came from numbers that, when called back, identify themselves as belonging to Synchrony. *Id.* ¶¶ 44–46. Those calls allegedly use automated or prerecorded voices and largely follow the same script as the calls that identify as coming from Synchrony. Compl. ¶¶ 44–46. TSC alleges that Synchrony intentionally placed each of the calls at issue, Compl. ¶ 48, and that TSC, as owner of the honeypot phone lines, did not consent to receive the calls from Synchrony using an artificial or prerecorded voice, *id.* ¶ 49.

### B.  Procedural Background

In 2015, TSC brought an action in the United States District Court for the Northern District of Illinois, alleging a violation of Section 227(b)(1)(A)(iii) of the TCPA against a different defendant, Asset Recovery Solutions. On August 8, 2016, the Northern District of Illinois issued a Ruling and Order granting the defendant's motion to dismiss and dismissed the case with prejudice. *See Tel. Sci. Corp. v. Asset Recovery Sols., LLC*, No. 15-CV-5182, 2016 WL 4179150 (N.D. Ill. Aug. 8, 2016). There, the court held that TSC's relevant interest, namely commercial data collection, was not within the "zone of interests" protected by Section 227(b)(1)(A). *Id.* at *7-*17.

On June 12, 2025, TSC filed a Complaint against Synchrony in this Court asserting a single count for violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and seeking statutory damages of $500 per violation, trebled to $1,500 per willful violation, along with injunctive relief and attorneys' fees. See Compl., ECF No. 1 ("Compl.").

On August 8, 2025, Synchrony filed a motion to dismiss the Complaint. Mot. to Dismiss, ECF No. 37 ("Mot.").

On September 12, 2025, TSC filed a memorandum in opposition to Synchrony's motion. Mem. in Opp. to Mot. to Dismiss, ECF No. 45 ("Mem. in Opp.").

On October 10, 2025, Synchrony filed its reply to TSC's memorandum in opposition. Reply, ECF No. 50 ("Reply").

## II.    STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (alteration in original) (citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of N.Y.C.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III.    DISCUSSION

Synchrony makes two arguments in support of its motion to dismiss the Plaintiff's Complaint.

First, Synchrony argues that the judgment rendered by the Northern District of Illinois in TSC's previous litigation against a different defendant precludes TSC from relitigating the issue of whether TSC falls within the TCPA's "zone of interests," thereby precluding the action in this

Court under the doctrine of non-mutual defensive collateral estoppel, also known as issue preclusion.[1]

Second, Synchrony argues that even if this Court finds that TSC is not collaterally estopped from pursuing its claim, the claim still fails because TSC cannot allege that it is within the zone of interests protected by Section 227(b)(1)(A)(iii) of the TCPA.

TSC argues that collateral estoppel does not apply for three reasons: the first element of collateral estoppel is not satisfied because the facts underlying the current action have changed; non-mutual defensive collateral estoppel does not apply to questions of law; and the legal climate has changed since 2016, rendering preclusion inappropriate. *See generally* Mem. in Opp.

TSC additionally argues that it has a cause of action because it falls within the TCPA's zone of interests, and TSC meets the statutory requirements of the TCPA. *Id.* at 7-22.

The Court discusses each in turn.

### A.  The 2016 Proceeding

In the 2016 litigation, TSC alleged that ARS "willfully and knowingly violated 47 U.S.C. § 227(b)(1)(A) on multiple and separate occasions by using an [automatic telephone dialing system] to call TSC at a telephone number assigned to a service for which TSC is charged for the call without TSC's prior express consent." ARS moved under Federal Rule of Civil Procedure 12(b)(6) claiming that TSC was "outside the TCPA's 'zone of interests'" and therefore could not pursue its claim. *Tel. Sci. Corp.*, 2016 WL 4179150 at *7.

---

[1] "The term 'non-mutual' indicates that a new defendant in the plaintiff's second lawsuit may defensively invoke collateral estoppel regarding issues of law or fact decided in the plaintiff's first action." *Jasper v. Sony Music Ent., Inc.*, 378 F. Supp. 2d 334, 343 (S.D.N.Y. 2005) (citing *Blonder–Tongue Labs. v. University of Illinois Found.*, 402 U.S. 313, 350 (1971) (holding that mutuality of parties was no longer a requirement of collateral estoppel)). "Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely 'switching adversaries.'" *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979).

6

In ruling on ARS' motion to dismiss, the court first determined, using principles of statutory interpretation, that Congress did not intend to "equate Article III standing with statutory standing under the TCPA," and that the zone-of-interests limitation applied instead. *Id.* at *8-10.[2]

Next, the court discerned the interests protected by the TCPA, and assessed whether TSC's interests were among them. Once more applying traditional principles of statutory interpretation, the court held that the "interests protected under 47 U.S.C. § 227(b)(1)(A)(iii), includ[e] individual privacy rights, public safety interests, and interstate commerce." *Id.* at *12. The court found that TSC's interest was in "commercial data collection" because "the sole reason [it] subscribe[d] to 'thousands' of honeypot numbers is to gather a 'large quantity' of data in order to 'detect high frequency robocalling patterns' and to 'distinguish' between callers for its Nomorobo customer-service offerings." *Id.* at *15.

Rather than being unwanted and unwelcome, the court found that the robocalls provided "the analytical basis on which the Nomorobo service operates." *Id.* Thus, "even construed in the light most favorable to TSC, these damages are not of the vexatious and intrusive nuisance nature sought to be redressed by Congress in enacting the TCPA, but rather are indirect, economic, and inherent to its business." *Id.* (cleaned up) (internal quotation marks and citation omitted).

---

[2] The Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.* clarifies that referring to the zone-of-interests analysis as statutory standing "correctly places the focus on the statute" but "is misleading" since the zone-of-interests doctrine is actually relevant to whether an individual has a cause of action under the relevant statute. 572 U.S. 118, 128 n.4 (2014); *see also A.H. by E.H. v. New York State Dep't of Health*, 147 F.4th 270, 288 (2d Cir. 2025) (Perez, J., concurring in part) ("In Lexmark , the Supreme Court addressed . . . the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked," which is now not about 'standing' at all, but is simply a principle of interpretation used to discern on whom a given law bestows a cause of action (or a defense).").

### B.  The Elements of Collateral Estoppel

Collateral estoppel "prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002). Four criteria must be satisfied in order for a court to apply collateral estoppel to an action: "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'" *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal citations omitted); *see also Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79 (2d Cir. 2019) (internal citations omitted).

Synchrony argues that the four elements of collateral estoppel are satisfied here. First, Synchrony argues that the issue of whether TSC falls within the zone of interests protected by Section 227(b)(1)(A)(iii) of the TCPA is identical to the issue raised in the 2016 litigation, which was brought under the same provision of the TCPA for calls to the same honeypot system maintained for the purpose of offering the same call-blocking product to customers. Mot. at 13-14.

Second, Synchrony argues that the zone-of-interests issue was presented in Asset Recovery Solutions' ("ARS") Rule 12(b)(6) motion to dismiss, and the court granted that motion "exclusively on the basis of [ARS'] zone-of-interests argument." *Id.* at 15 (citation omitted).

Third, Synchrony argues that TSC had a full and fair opportunity to litigate the zone-of-interests issue through its memorandum in opposition to the defendant's motion to dismiss, two amendments to its complaint to address the issue, a motion for post-judgment relief regarding the issue, and an appeal to the Seventh Circuit. *Id.* at 15-17.

8

Fourth, and finally, Synchrony argues that the resolution of the zone-of-interests issue was "undeniably necessary to [the court's] decision to dismiss TSC's action with prejudice." *Id.* at 17-18.

In response, TSC first argues that the 2016 litigation is not identical to the current action because it "involved different calls made by a different defendant in a different circuit and with TSC under different ownership and using a different business model." Mem. in Opp. at 22. Next, TSC argues that preclusion is inappropriate since "intervening Supreme Court and lower court precedent, including from this very Court" have changed the "legal climate" since the 2016 litigation. Finally, TSC argues that non-mutual defensive issue preclusion does not apply to questions of law, including the use of statutory interpretation to determine the zone-of-interests issue in the 2016 litigation.

Synchrony replies that "the issue decided by [the 2016 court]—whether TSC, a specific plaintiff with a specific business model, falls within the TCPA's zone of interests—is a classic example of applying law to facts and does not fit within the narrow exception for purely legal questions." Reply at 1. Next, Synchrony argues that the legal climate has not changed since the 2016 litigation, since the Supreme Court's ruling in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 is still the "controlling articulation of the zone-of-interests doctrine." *Id.* at 3. Synchrony also argues that the facts relevant to the Northern District of Illinois' ruling on the zone-of-interests issue have not since changed.

Finally, Synchrony argues that a district court's "discretion" to withhold the application of the collateral estoppel doctrine where its application would result in unfairness only applies to offensive, as opposed to defensive, collateral estoppel, and in any case, there is nothing unfair about applying the doctrine in this case. *Id.* at 5-6.

The Court agrees.

Synchrony has carried its "burden of showing that the two proceedings involve identical issues." *Bader v. Goldman Sachs Grp., Inc.*, 455 Fed.Appx. 8, 9 (2d Cir. 2011) (summary order). TSC brought both actions under the same statutory provision, 47 U.S.C. § 227(b)(1)(A)(iii). *See Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 48 (2d Cir. 2014) (where the issue in question "concern[s] the legal significance of [certain] facts . . . the legal standards to be applied must also be identical").

In both cases, TSC alleged that both defendants willfully and intentionally violated the statute by placing numerous calls to Nomorobo's honeypot numbers, without TSC's consent, and at a cost to TSC. *See* Compl. ¶ 35, 40, 57, 48; *Tel. Sci. Corp.*, 2016 WL 4179150 at *1-2. TSC has also alleged in both actions that the "honeypot" of phone numbers served a central business purpose for the Nomorobo service offered to customers in 2016 and still today. *See* Compl. ¶ 2, 31, 33; *Tel. Sci. Corp.*, 2016 WL 4179150 at *1, 13. And in both cases, whether TSC could proceed in its case depended on whether its interests in enforcing Section 227(b)(1)(A)(iii) against each respective defendant were within the "zone-of-interests" protected by the statute.

TSC suggests that two facts establish that the issues in this action are meaningfully different from the 2016 litigation. First, TSC argues that the fact that it has "operated for nearly a decade without suing anyone . . . is not only relevant; it's controlling." Mem. in Opp. at 28. Presumably, TSC believes this fact is relevant because it refutes the contention that TSC's interest is that of a "professional plaintiff" whose interest falls outside of the zone-of-interests protected by the statutory provision.

TSC misunderstands the previous court's ruling. The 2016 decision discussed many types of professional plaintiffs whose interests may not be eligible to establish a cause of action under

the TCPA. For example, the court discussed a case in which the plaintiff "admitted that she filed TCPA actions as a business." *Tel. Sci. Corp.*, 2016 WL 4179150 at \*14 (citing *Stoops v. Wells Fargo Bank, N.A.*, No. 3:15-83, 2016 WL 3566266, at \*5, 9 (W.D. Pa. June 24, 2016)). While TSC does not maintain its honeypot lines to generate TCPA litigation, this fact does not alter TSC's interest in enforcing Section 227(b)(1)(A)(iii) of the TCPA, which the previous court determined to be commercial data collection.

While TSC argues that its business model today is "somewhat different" because TSC has since "developed the Nomorobo Max product that does not rely on the honeypot" and "Nomorobo is now under different ownership," Compl. ¶ 24, the fact of TSC's ownership does not change that TSC's alleged injuries are "indirect, economic, and inherent to its business." *Tel. Sci. Corp.*, 2016 WL 4179150 at \*15 (internal citation and quotation marks omitted). And as TSC admits, the Nomorobo Max product operates separately from the honeypot, which is the factual basis for the Plaintiff's claim against Synchrony. In fact, Nomorobo Max was created to avoid the defendant's alleged actions entirely. Compl. ¶¶ 24, 35.

TSC has alleged no new or unique facts to suggest that the zone-of-interests issue presented in this action is different from the 2016 litigation. *See, e.g., Phoenix Light SF Ltd. v. Bank of New York Mellon*, 66 F.4th 365, 371 (2d Cir. 2023) ("[T]he district courts correctly determined that the champerty-based prudential-standing issue in the BNY Mellon 2014, BNY Mellon 2018, and Deutsche Bank Actions was decisive and identical to the one decided in the U.S. Bank Action, because it was undisputed below and on appeal that materially identical transactions with the CDO Trustees were at issue in all the actions."); *cf. Toussie v. Cnty. of Suffolk*, 806 F. Supp. 2d 558, 572 (E.D.N.Y. 2011) ("The Article 78 proceeding dealt exclusively with the 2002 Auction, and the court there held that the Legislature's disapproval of that

11

particular sale to Plaintiffs was not arbitrary or capricious. The Supreme Court's opinion, the appellate record, and the Second Department's opinion are void of any facts regarding the 2001 Auction or the 2004 Auction. Since Plaintiffs have not had any opportunity to argue the unique facts of either of the other two auctions, collateral estoppel will not preclude those claims."). Thus, Synchrony has satisfied the first element of its collateral estoppel defense.

To satisfy the second element, Synchrony must show that the zone-of-interests issue was actually litigated and decided in the 2016 proceeding. "An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined." *Faraday v. Blanchette*, 596 F. Supp. 2d 508, 515 (D. Conn. 2009); *see also Gladstein v. Goldfield*, No. 3:18-CV-00926 (VAB), 2021 WL 2037799, at *5 (D. Conn. May 21, 2021). Where the prior court "addressed all the elements of the statute and cited supporting evidence," the issue has been actually litigated and decided. *Schulz v. United States*, 44 F.Supp.3d 307, 311 (N.D.N.Y. 2017).

In the 2016 proceeding, ARS raised the zone-of-interests issue in its Rule 12(b)(6) motion to dismiss. When ruling on the motion to dismiss, the court determined that the zone-of-interests limitation applied, identified the interests protected by the statutory provision, identified TSC's interest, and determined that TSC's interest fell outside of the zone of interests protected by the statute. Based on this analysis, the court dismissed the Second Amended Complaint with prejudice and determined that it "need not reach ARS' other arguments in favor of Rule 12(b)(6) dismissal." *Tel. Sci. Corp.*, 2016 WL 4179150 at *17. In other words, the court decided ARS' motion to dismiss solely on the zone-of-interests issue. Thus, Synchrony has shown that the relevant issue was actually litigated and decided in the 2016 proceeding, thereby satisfying the second element of the collateral estoppel defense.

As distinct from the "actually litigated" element, the third element requires that the party opposing collateral estoppel had a full and fair opportunity to litigate the issue. This requires the court to examine whether the party "was fully able to raise the same factual or legal issues . . . assert[ed in the prior proceeding]." *LaFleur v. Whitman*, 300 F.3d 256, 274 (2d Cir. 2002). In the prior litigation, TSC filed two briefs responding to ARS' motion to dismiss. *See Tel. Sci. Corp. v. Asset Recovery Sols.*, LLC, 2017 WL 56634, at \*4 (N.D. Ill. Jan. 5, 2017). TSC also amended its complaint twice in an attempt to address the zone-of-interests issue. *See id.* at \*5-6. Because TSC had several opportunities to raise the factual and legal issues relevant to TSC's interests under the TCPA in its complaint and subsequent briefing in response to the motion to dismiss, TSC had a full and fair opportunity to litigate the issue, thereby satisfying the third element of collateral estoppel.[3] *See Clark v. New York City Hous. Auth.*, No. 25-486-CV, 2025 WL 3702955 (2d Cir. Dec. 22, 2025) (finding the plaintiff had a full and fair opportunity to litigate her tort claims where she was given notice and opportunity to provide expert testimony, despite her "inability" to do so); *see also VDARE Found., Inc. v. James*, 162 F.4th 77, 85 (2d Cir. 2025) (finding that plaintiff had a full and fair opportunity to litigate its claim in state-court special proceeding that did not allow for the bringing of a counterclaim or discovery without leave of the court); *King v. Fox*, 418 F.3d 121, 130 (2d Cir. 2005) ("Factors to be considered when determining whether there was a full and fair opportunity to litigate the issue in the prior action include the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a

---

[3] TSC states in its Complaint that it "lacked the funds to continue with an appeal of the court's decision" in 2016. The procedural history reflects that TSC pursued an appeal, but later filed a motion to voluntarily dismiss the appeal. *See Tel. Sci. Corp. v. Asset Recovery Sols.*, LLC, 2017 WL 3443007, at \*1 (7th Cir. Apr. 28, 2017).

compromise verdict, differences in the applicable law and foreseeability of future litigation.")
(internal citation and quotation marks omitted).

The last element asks whether the resolution of the issue was necessary to support a valid
and final judgment on the merits. "An issue is 'necessary or essential only when the final
outcome hinges on it.'" *Bifolck*, 936 F.3d at 82 (quoting *Bobby v. Bies*, 556 U.S. 825, 835
(2009)). "This requirement 'protects' against unfairness by ensuring that the issue was 'really
disputed and that the loser . . . put out his best efforts.'" *Id.* (quoting *S.E.C. v. Monarch Funding
Corp.*, 192 F.3d 295, 307 (2d Cir. 1999)) (cleaned up); *see also United States v. Hussein*, 178
F.3d 125, 129 (2d Cir. 1999) (explaining that when an issue was unnecessary to a judgment, the
parties may have had "limited incentive to litigate [it] fully," and it may have been "less likely to
receive close judicial attention" (citation omitted)). As discussed above, the court's resolution of
the zone-of-interests argument was determinative of the court's final judgment granting ARS'
motion and dismissing the case with prejudice. Immediately following the court's analysis
finding that TSC was not within 47 U.S.C. § 227(b)(1)(A)(iii)'s zone of interests, the court
stated, "[b]ased on the foregoing analysis, the Court dismisses the Second Amended Complaint
with prejudice. Given this disposition, the Court need not reach ARS' other arguments in favor of
Rule 12(b)(6) dismissal." *Tel. Sci. Corp.*, 2016 WL 4179150 at *17 (citing *Friends of Trumbull
v. Chicago Bd. of Educ.*, 123 F. Supp. 3d 990, 999 (N.D. Ill. 2015) (dismissing with prejudice
claims that failed to satisfy the "zone-of-interests" test and collecting cases)). The court's
dismissal of TSC's Second Amended Complaint hinged on the finding that TSC was not within
the statute's zone of interests. Therefore, the fourth element of the collateral estoppel has been
met.

14

### C.  The Question-of-Law Exception

The Supreme Court's cases "recognize an exception to the applicability of the principles of collateral estoppel for 'unmixed questions of law' arising in 'successive actions involving unrelated subject matter.'" *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 171 (1984) (citing *Montana v. United States*, 440 U.S. 147, 162 (1979)). "The exception seems to require a determination as to whether an 'issue of fact' or an 'issue of law' is sought to be relitigated and then a determination as to whether the 'issue of law' arises in a successive case that is so unrelated to the prior case that relitigation of the issue is warranted." *United States v. Stauffer Chem. Co.*, 464 U.S. at 171.

TSC argues that the zone-of-interests issue is a pure question of law because the 2016 court used statutory interpretation to reach its conclusion. Mem. in Opp. at 25-26.

Synchrony responds that the zone-of-interests issue "is a classic example of applying law to facts and does not fit within the narrow exception for purely legal questions." Reply at 1.

The Court agrees.

Although the previous court used tools of statutory interpretation to determine what interests were protected by the statute, it necessarily applied the law to facts in order to determine whether TSC had a cause of action. For example, it took into consideration several facts: that Nomorobo "helped consumers to avoid over 64 million unwanted robocalls"; that TSC "subscribes to 'thousands' of honeypot numbers is to gather a 'large quantity' of data in order to 'detect high frequency robocalling patterns'"; and that TSC "began to answer—and incur charges for—known robocalls in May 2015[.]" *Tel. Sci. Corp.*, 2016 WL 4179150 at *15-16. The question of whether TSC fell within the zone of interests protected by 47 U.S.C.

15

§ 227(b)(1)(A) required the court to apply law to facts and was therefore a mixed question of law and fact.

Accordingly, the legal question exception to the use of collateral estoppel does not apply. *See United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719 (2d Cir. 1993) ("There are exceptions to the use of collateral estoppel . . . where pure questions of law—unmixed with any particular set of facts—are presented to a court . . .").

### D. The Change-in-Law Exception

"Even when the elements of issue preclusion are met, [] an exception may be warranted if there has been an intervening 'change in [the] applicable legal context.'" *Herrera v. Wyoming*, 587 U.S. 329, 343 (2019) (quoting *Bobby v. Bies*, 556 U.S. at 834); *see Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 363 (1984) (refusing to apply collateral estoppel where "an early decision [was] based upon a now repudiated legal doctrine").

TSC argues that this Court should not apply collateral estoppel because subsequent district court rulings have disagreed with the 2016 decision and the Supreme Court's ruling in *Bostock v. Clayton County*, 590 U.S. 644 (2020), "eliminat[ed] extratextual limitations on who can bring causes of action[.]" Mem. in Opp. at 27-28. Because the *Bostock* decision instructs a court to choose the "express terms of a statute" over "extratextual considerations," *Bostock*, 590 U.S. at 652–53, TSC argues that "a federal court may not attempt to divine a kind of 'primary intent' of the TCPA . . . and then limit a plaintiff's standing on that basis." Mem. in Opp. at 20-21. TSC argues that because "the TCPA's plain text . . . allows any 'person or entity' who receives such calls to sue," the Plaintiff has a cause of action under the statute. *Id.* at 21.

Synchrony responds that the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), on which the 2016 court relied to reach its

16

conclusion, remains the "controlling articulation of the zone-of-interests doctrine" after *Bostock*. Reply at 3-4. Synchrony notes that the Second Circuit continues to apply *Lexmark* when determining a statute's zone of interests, and that the lower court decisions that TSC relies on are "both factually and legally distinguishable" and "do not . . . alter the controlling legal framework in *Lexmark*." *Id.* at 4. Finally, Synchrony argues that the 2016 court did not "rely on extratextual, purposive glosses." *Id.* at 7-8. Rather, "the zone of interests protected by Section 227(b)(1)(A)(iii) of the TCPA is defined by explicit Congressional findings that are part of the statutory text, not untethered from it." *Id.*

The Court agrees.

In *Bostock*, employees sued their employers for terminating them after the employers learned of their employees' homosexuality or transgender status. The Supreme Court interpreted Title VII's language prohibiting discrimination "because of sex" to encompass discrimination against gay and transgender individuals. 590 U.S. at 660. To reach this conclusion, the Court relied on the "ordinary public meaning of [Title VII's] terms at the time of its enactment" and found that the "because of" language in the statute incorporated the "but-for" causation standard to establish discrimination. *Id.* at 654. The Supreme Court stated that in the absence of ambiguity, the express terms of a statute control. *Id.* at 674-75. The Supreme Court's decision did not, however, bear on the zone-of-interests doctrine, nor did it restrict the tools of statutory interpretation a court may use to ascertain a statute's zone of interests.

In *Lexmark*, the Supreme Court held that "a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." 572 U.S. at 134. While the Supreme Court recognized that this limitation was originally formulated for the cause of action conferred by the Administrative Procedure Act, it has "since made clear,

17

however, that it applies to all statutorily created causes of action; that it is a requirement of general application . . . which applies unless it is expressly negated." *Id. Lexmark* remains good law, and the zone-of-interests doctrine is the appropriate test for analyzing the availability of a cause of action where the limitation has not been expressly negated by the explicit terms of the statute.

Since 2020, the year in which *Bostock* was decided, the Second Circuit has continued to recognize and apply the zone-of-interests analysis and has used tools of statutory interpretation to determine those interests. *See Whitaker v. Dept. of Commerce*, 970 F.3d 200 (2d Cir. 2020) (declining to reach the zone-of-interests question but recognizing that the zone-of-interests analysis determines whether a party has a cause of action under the statute and citing to *Lexmark* for that proposition); *Moya v. United States Dept. of Homeland Security*, 975 F.3d 120 (2d Cir. 2020) (holding that non-profit organization's "derivative interests" did not fall within the zone of interests of the INA and Administrative Procedure Act and using congressional intent as a "traditional tool of statutory interpretation" to reach this conclusion); *A.H. by E.H. v. New York State Dept. of Health*, 147 F.4th 270 (2d Cir. 2025) (Perez, J., concurring in part) (discussing *Lexmark* and the zone-of-interests doctrine in relation to the third-party standing bar); *Connecticut Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC,*, 167 F.4th 605 (2d Cir. 2026) (recognizing that the zone-of-interests analysis determines whether a plaintiff has a cause of action under a statute but declining to address whether the plaintiff in this case fell within the zone of interests because the defendant did not challenge that part of the district court's decision on appeal).[4] And the Supreme Court, the only court with the authority to overturn the *Lexmark*

---

[4] Only two district courts have issued rulings since *Bostock* referencing, in different sections and with respect to different concepts, both *Lexmark* and *Bostock*. But neither of these rulings remotely suggest that the Supreme Court's decision in *Bostock* alters the Supreme Court's ruling in *Lexmark* or the zone-of-interests analysis. *See New*

18

decision, has not done so. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 451 (2021) (Thomas, J., dissenting) (In the only Supreme Court decision mentioning the zone of interests following *Bostock*, Justice Thomas explained that the injury-in-fact requirement for Article III first developed with concern to statutory standing and the Supreme Court later "graft[ed] it onto its constitutional standing analysis.").

There has been no intervening change in the applicable legal context since the 2016 decision. Therefore, the change-in-law exception to the use of collateral estoppel does not apply. *See Herrera*, 587 U.S. at 343 (collecting cases). Because the 2016 proceeding satisfies the elements of collateral estoppel, and because no exception to collateral estoppel applies, the Court finds that the doctrine of collateral estoppel precludes TSC's claim in the current action.[5]

Accordingly, the Court grants Synchrony's motion to dismiss.

---

*York v. Trump*, 485 F. Supp. 3d 422 (S.D.N.Y.), *vacated and remanded,* 592 U.S. 125, 141 (2020); *New York v. United States Dep't of Lab.*, 477 F. Supp. 3d 1 (S.D.N.Y. 2020).

[5] Even if TSC's claim was not precluded under the doctrine of collateral estoppel, TSC's claim does not fall within the zone of interests protected by 47 U.S.C. § 227(b)(1)(A). Consistent with the analysis conducted in *Tel. Sci. Corp.*, 2017 WL 56634, the prohibitions of this specific statutory provision "protect against unwanted and/or otherwise inconvenient robocall practices, particularly those that implicate privacy and/or public safety concerns." *Id.* at *12. "[E]ven accepting all factual allegations as true, and drawing all reasonable inferences in TSC's favor, TSC's asserted interests do not fall within Section 227(b)'s protected zone of interests." *Id.* at *15. As a result, "[b]ecause TSC has failed to allege an interest with which the TCPA is concerned – privacy invasion, nuisance, public safety threat, and/or the shifting of costs based on unwelcome robocalls—the Court finds that TSC lacks statutory standing under 47 U.S.C. § 227(b)(1)(A)(iii)." *Id.* at *16. TSC's arguments to the contrary fall short. For example, in arguing for statutory standing, TSC focused – at least in part – on another provision of the TCPA, Section 227(b)(1)(C), regarding junk-fax prohibitions. *See* Mem. in Opp. at 11-13 (collecting cases). Apart from the argument raised by Synchrony that "the zone-of-interest test is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which [the plaintiff] relies," Reply at 9 (quoting *Moya*, 975 F.3d at 131 (citations and internal quotation marks omitted)), the scope of standing under this other statutory provision should not be construed differently as TSC suggests. *See Gorss Motels, Inc. v. Land's End, Inc.*, 997 F.3d 470, 476 (2d Cir. 2021) ("The injuries caused by unwanted fax advertisements – nuisance and privacy invasion, occupation of the plaintiff's fax machine, and use of its materials – occur the moment the unwanted fax is received, regardless of whether the sender can establish a defense to liability under the TCPA. Because Gorss has alleged a sufficient injury in fact, fairly traceable to the fax advertisements it received and redressable by a favorable decision, we conclude that Gorss has standing to proceed."). Indeed, the Second Circuit in this *Gorss Motels* decision focused on nuisance, privacy invasion, and shifting of costs, qualities also considered by the district court in the earlier *TSC* standing decision. *Gorss Motels*, 997 F.3d at 476; *Tel. Sci. Corp.*, 2016 WL 4179150 at *16.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is **GRANTED** with prejudice.[6]

The Clerk of Court is respectfully directed to enter judgment for the Defendant, and to close the case.

**SO ORDERED** at New Haven, Connecticut, this 30th day of March, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[6] For the reasons stated above, and given the prior litigation, the Court will not grant leave to amend the Complaint, finding any such effort to be futile. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012) ("Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies . . ."); *see also Goldberg v. Cablevision Sys. Corp.*, 193 F. Supp. 2d 588, 598 (E.D.N.Y. 2002) ("Where, as here, a plaintiff's motion for leave to amend is filed in response to a motion to dismiss under Fed. R. Civ. P. 12(b)(6), 'leave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, *i.e.,* if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief.'" (quoting *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104 (2d Cir. 2001))).